## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 24 2020, 9:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
– Appellate Division

Danielle Sheff
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of A.E. (Minor Child) and <br><br> K.E. (Mother), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services,[1] | July 24, 2020 <br><br> Court of Appeals Case No. 20A-JT-109 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Scott Stowers, Magistrate <br><br> Trial Court Cause No. 49D09-1902-JT-189 |

---

[1] DeDe K. Connor filed an appearance on behalf of Appellee-Guardian ad Litem, Child Advocates, Inc., but did not file a brief on appeal.

*Appellee-Petitioner.*

**Mathias, Judge.**

[1] K.E. ("Mother") appeals the Marion Superior Court's order terminating her parental rights to A.E., her minor child. On appeal, K.E. raises two issues, which we restate as:

I. Whether Mother's due process rights were violated because DCS failed to make reasonable efforts to reunify Mother with A.E.; and,

II. Whether the trial court's order terminating Mother's parental rights is supported by clear and convincing evidence.

[2] We affirm.

## Facts and Procedural History

[3] Mother's child, A.E., was born on January 13, 2013. On November 6, 2017, the Department of Child Services ("DCS") filed a petition alleging A.E. was a Child In Need of Services ("CHINS"). Mother was incarcerated for Level 3 felony robbery when the CHINS petition was filed. A.E.'s father was also incarcerated.

[4] Mother left A.E. with unsuitable caregivers who lacked stable housing and who had tested positive for methamphetamine and marijuana. Mother also used illegal substances. DCS removed A.E. and placed him in foster care.

Throughout these proceedings, Mother was incarcerated for violating the terms of her probation imposed on the robbery conviction.

[5] A.E. had several untreated medical conditions when he was taken into DCS custody including head lice, dental cavities, and lead exposure. He also had significant behavioral issues, which included destroying property and throwing objects at adults. A.E. would scream and cry incessantly for significant periods of time. A.E. also stated that he wanted to kill himself.

[6] In March 2018, Mother admitted that A.E. was a CHINS because she lacked a stable home free from substance abuse. Mother was ordered to participate in home-based case management and Behavioral Health Court,[2] which required substance abuse treatment, random drug screening, and mental health treatment. Mother was ordered to abide by the terms of her probation. The court also ordered five-year-old A.E. to participate in therapy.

[7] Mother participated in supervised visitation with A.E. between December 2017 and May 2018. Mother also completed the initial assessments. However, Mother did not participate in the recommended services and was inconsistent with her treatment goals. She missed drug tests and failed to show for appointments with her probation officer and recovery coach. Mother's

---

[2] The purpose of Behavioral Health Court is to assist first time offenders with receiving mental health and substance abuse treatment in the community in lieu of serving a sentence in jail or prison.

participation in Behavioral Health Court was terminated, and she was ordered to complete her sentence in the Department of Correction.

[8] Mother failed to successfully participate in home-based case management and did not complete her goals. Mother also failed to maintain sobriety and used cocaine and marijuana.

[9] During Mother's supervised visitation with A.E., she was attentive to A.E. but did not properly redirect him when he misbehaved. Mother refused to incorporate the visitation supervisor's suggestions concerning her response to A.E.'s behavior. Mother cancelled visitations and eventually stopped participating in visitation. Mother also failed to maintain contact with her family case manager.

[10] Mother and Father failed to appear for a permanency hearing held on February 6, 2019, and their whereabouts were unknown. Neither parent had completed the services ordered in March 2018 during the disposition hearing. For these reasons, the court changed A.E.'s permanency plan from reunification with a parent to termination of the parent-child relationship. On February 12, 2019, DCS filed a petition to terminate Mother's rights to A.E.

[11] On May 31, 2019, Mother was a passenger in a car that was involved in an accident. At the scene of the accident, Mother punched the driver. She also gave a police officer her sister's name to avoid being arrested on an open warrant. Mother was arrested for battery, and her true identity was revealed

when law enforcement officers processed her arrest. In July 2019, Mother pleaded guilty to battery.

[12] The trial court held a fact-finding hearing on the termination petition on November 6 and 20, 2019.[3] A.E.'s therapist described A.E.'s "exceptional progress" while he has been in foster care and therapy but testified that he needs stability. Tr. pp. 51–52. A.E.'s Court Appointed Special Advocate ("CASA") testified that termination of Mother's parental rights was in A.E.'s best interests. Tr. pp. 99–100.

[13] On December 18, 2019, the trial court issued its order terminating Mother's parental rights to A.E. In pertinent part, the trial court found:

> 8. Katherine McHone, of Children's Bureau, provided therapy to the child from November 2017 to March 2018.
>
> 9. [A.E.] was initially quiet when he began working with Ms. McHone. The child also behaved aggressively during Play Therapy with Ms. McHone.
>
> 10. The child was closed off to discussions about his family.
>
> 11. Over time, the child opened up; became more responsive; and behaved less aggressively.
>
> ***
>
> 14. Kelly Joachim of Centerstone Recovery Center was [K.E.'s] Recovery Coach from December 2017 to May 2018.

---

[3] Father voluntarily terminated his parental rights and signed consents to A.E.'s adoption.

15. [K.E.] was to participate with Midtown for outpatient treatment.

16. [K.E.] did complete an assessment at Midtown. However, she did not engage in treatment.

17. [K.E.] was inconsistent in meeting her treatment goals.

18. [K.E.] was criminally sentenced in July 2019, and her Behavioral Health Court with Centerstone was closed.

19. Lydia Spencer of Children's Bureau was the child's foster care case manager from November 2017 to September 2018.

20. When Ms. Spencer began working with [A.E.], the child had several medical issues.

21. The child had severe head lice that required his head to be shaved.

22. The child also had cavities and lead exposure.

23. Ms. Spencer provided the child transportation to medical appointments.

24. The child was mature and open about his experiences.

25. He was eager to learn and very engaged in school. He progressed well and made good grades.

26. The child did have some behavioral concerns while working with Ms. Spencer. He attempted to get out of a moving vehicle and was destructive with property.

27. In April 2018, Ms. Spencer observed the child throw a two hour tantrum when the child was informed that his mother cancelled a parenting time session.

28. The lengthy tantrum consisted of the child jumping on stairs; throwing objects; and screaming.

29. Following the child's behavioral issues, Ms. Spencer referred him to therapy.

30. After observing the child's behavioral problems following his mother cancelling parenting time, Ms. Spencer recommended that [K.E.'s] parenting time be reduced.

31. Angelique Parker of Stepping Stones has been the child's therapist since March 2018.

32. Ms. Parker has established the goal of helping the child process through therapy.

33. Initially, the child was full of anger and demonstrated impulsive behavior.

34. [A.E.'s] aggressive behavior occurred after his mother did not appear for parenting time sessions.

35. After moving to a new foster home in [] September or October 2018 and after receiving medication, the child's behavior improved and he was able to be coached through tantrums.

36. [A.E.] has made exceptional progress. His school behavior has improved. He has lost weight and has gained confidence and is easier to redirect.

37. [K.E.] has not seen the child since June 2018.

38. The child has been in his current foster home since July 2019. He is happy in this placement.

*** 

40. Jacqueline Vanterpool of Hoosier Families and Branches of Life provided home based case management and supervised parenting time for [K.E.] from November 2017 to December 2017.

41. Ms. Vanterpool established goals for [K.E.] of maintaining housing; maintaining employment; and maintaining sobriety.

42. Initially, [K.E.] did well with Ms. Vanterpool. However, her participation began to wane and she had numerous "no shows" and cancellations.

43. [K.E.] would often fail to appear for parenting time sessions. At the sessions that she did appear, she was attentive to the child but did not properly redirect him.

44. In the summer of 2018, [K.E.] began to make threats to Ms. Vanterpool regarding her daughter and her employment. These threats were made in the presence of the child.

45. Ms. Vanterpool closed out [K.E.] unsuccessfully in the Summer of 2018 due to non-compliance.

46. In May 2018, [K.E.] had a drug relapse after seven months of sobriety in which she blamed DCS.

47. [K.E.] has resided in the Indiana Women's Prison since July 16, 2019. Before that, she was incarcerated in the Marion County Jail from May 2019 to July 16, 2019.

48. [K.E.] is serving a "split sentence" of 2008 days which consists of 973 days in the Indiana Department of Correction with 170 actual days credit plus 57 days good time credit totaling 227 days; 1035 Community Corrections at Craine House (work release) for 730 days plus 305 days of home detention.

49. [K.E.] states that her projected release date is January 20, 2021.

\*\*\*

55. [K.E.] admits to a history of drug addiction wh[ich] began when she was nineteen years old.

\*\*\*

58. By her own admission, [K.E.] did not comply with the conditions of Behavioral Health Court or probation.

Appellant's App. pp. 18–19.

[14] The trial court concluded that there is a reasonable probability that the conditions that resulted in the child's removal and continued placement outside of the home will not be remedied because K.E.

> had two (2) years to put forth an effort and has not done so. She knowingly falsified reports to the Court and to the police in an attempt to avoid arrest warrants. In doing so, she willingly absented herself from the child's life as well as from Court ordered services designed to enhance her parenting ability as well as assist her in addressing her substance abuse addiction. Sobriety and stability remain major concerns.

*Id.* at 19. The court also concluded that continuation of the parent-child relationship poses a threat to A.E.'s well-being because "it would serve as a barrier for him obtaining permanency through an adoption when his mother is unable and unavailable to offer permanency and parent." *Id.* The trial court concluded that termination of K.E.'s parental rights was in A.E.'s best interests because A.E. needs stability that K.E. cannot provide. *Id*.

[15] K.E. appeals the trial court's order terminating her parental rights.

## Standard of Review

[16] Indiana appellate courts have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness

credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cty. Off. of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[17] Mother challenges only one of the trial court's factual findings as being clearly erroneous.[4] We therefore accept the trial court's unchallenged findings as true and determine only whether these unchallenged findings are sufficient to support the judgment. *In re A.M.,* 121 N.E.3d 556, 562 (Ind. Ct. App. 2019), *trans. denied*; *see also T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) (holding that when the trial court's unchallenged findings support termination, there is no error), *trans. denied*.

## I. Due Process Claims

[18] First, Mother argues that her due process rights were violated because the trial court failed "to consider evidence that [K.E.'s] circumstances at the time of the [fact-finding] hearings were not the same as when her drug relapse and criminal convictions occurred," therefore depriving K.E. of her due process rights and

---

[4] In finding number 44, the trial court found that Mother made a threat to her service provider in the presence of children. The testimony to support this finding was somewhat confusing and equivocal. We do not consider this finding in our resolution of the issues presented in this appeal.

entering a "termination order based in large part on K.E.'s incarceration." Appellant's Br. at 30. K.E. also claims that her due process rights were violated because DCS failed to make reasonable efforts to reunify K.E. and A.E.

[19] In support of these arguments, Mother relies on *In re T.W.*, 135 N.E.3d 607 (Ind. Ct. App. 2019), *trans. denied*. In that case, our court observed that DCS is not statutorily required to provide parents with services before seeking to terminate the parent-child relationship. *Id.* at 612. "However, parents facing termination proceedings are afforded due process protections." *Id.* "The nature of the process due in any proceeding is governed by a balance of three factors: the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." *Id.* at 613 (quotations omitted).

> The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of his or her child. And the State's interest in protecting the welfare of a child is also substantial. Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

*K.M. v. Ind. Dep't of Child Serv.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)).

[20] Our court engaged in a significant discussion of the due process rights afforded to parents during CHINS and termination proceedings in *In re D.H.*, 119

N.E.3d 578 (Ind. Ct. App. 2019), *aff'd in relevant part on reh'g* 122 N.E.3d 832 (Ind. Ct. App. 2019), *trans. denied*.

In looking at the risk of error created by DCS's actions, we keep in mind that "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." "[T]hese two proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter." And "[a]ny procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights."

For example, in *Matter of C.M.S.T.*, we held that procedural irregularities in the CHINS case—such as multiple FCMs, inappropriate behavior by FCMs, and apparent bias of FCMs— contributed to the parents' non-compliance such that termination of their parental rights amounted to a denial of their due process rights. *See also, In re A.P.*, [734 N.E.2d 1107,] 1117 [(Ind. Ct. App. 2000), *trans. denied*] (finding parents' due process rights were violated in a termination action where DCS made multiple procedural errors, such as failing to provide parents with copies of case plans and filing CHINS and termination petitions that did not meet statutory requirements); *cf. N.P. v. Ind. Dep't of Child Serv. (In re R.P.)*, 949 N.E.2d 395, 403 (Ind. Ct. App. 2011) (citing *J.I. v. Vanderburgh Cty. Off. of Family & Children (In re A.I.)*, 825 N.E.2d 798, 816 (Ind. Ct. App. 2005) (noting that one procedural deficiency alone may not result in a due process violation), *trans. denied*).

We must also consider the general proposition that, "if the State imparts a due process right, then it must give that right." Indiana Code Sections 31-35-2-4.5(d)(2) and (3) require that DCS file a motion to dismiss an otherwise-required termination petition

when DCS has failed to provide family services and either the period for completion of the services has not expired or the services are substantial and material in facilitating return of the child to the home. And DCS's own policy manual, . . . provides unequivocal directions to DCS regarding the provision of services. First, it states that DCS "will provide family services to all children and families with an open case." Next, Chapter 5, Section 10 of the Manual states:

> DCS will . . . develop a Family Service Plan . . . [and] will make appropriate service referrals on behalf of the . . . family . . . DCS will regularly communicate with all service providers throughout the life of the case to discuss the family's progress and any concerns.

> DCS will reassess the strengths and needs of the child and family throughout the life of the case and will adjust services, if necessary, to meet identified needs. DCS will continue to offer services to the ... family regardless of participation.

> * * *

> The FCM will: . . . (3) Collaborate with the family and the CFT [Child and Family Team] to identify needed services . . . (5) Monitor the family's progress by: (a) maintaining contact with services providers to assess the family's level of participation in services. . . (8) Discuss the family's participation and progress regarding case goals and results of any new assessments . . . and adjust services and/or service levels as necessary . . . (9) Document in Management Gateway for Indiana Kids (MaGIK) the family's progress, reasons for service type or intensity changes, and if applicable, reasons why services were not offered or were stopped[.]

The FCM will: . . . (3) Follow up with service providers to evaluate the family's response to the change and/or removal of services.

*Id.* at 588–89 (citations, quotations, and emphasis omitted).

[21] In *T.W.*, our court concluded that the Father's due process rights were violated because DCS failed to make reasonable efforts to preserve and/or reunify Father with his child. 135 N.E.3d at 615 (explaining that "[w]hat constitutes 'reasonable efforts' will vary by case, and . . . it does not necessarily always mean that services must be provided to the parents."). Father, who was incarcerated when the CHINS proceedings were initiated, attempted to establish paternity of the child and participate in services and visitation. His efforts were thwarted by DCS service providers' inappropriate or misleading conduct. DCS "made only limited efforts at reunification" after Father was released from incarceration. *Id.* at 616. DCS failed to make a referral for a parent aide, failed to adequately communicate with Father, failed to facilitate visitation between Father and the child, and misinformed him concerning the steps he was required to take to establish paternity. *Id.* at 615–18.

[22] Unlike the circumstances presented in *T.W.*, DCS attempted to provide services and assistance to Mother with the goal of reunifying Mother and A.E. Mother completed the initial assessments and participated in supervised visitation with A.E. But after six months, she began to cancel visitations, failed to submit to drug screens, and failed to maintain contact with DCS service providers and her probation officer and recovery coach in Behavioral Health Court. Mother

admitted that she began using illegal substances again and stopped participating in services because she had an open arrest warrant. Mother was offered mental health treatment but declined to participate because she did not care for the Midtown employee who performed the mental health assessment.

[23] In conjunction with the services provided through Behavioral Health Court, DCS made reasonable efforts to reunify Mother with A.E. Mother failed to take advantage of the offered services and was incarcerated once again. For these reasons, Mother has not established that her due process rights were violated.

## II. Clear and Convincing Evidence

[24] Mother claims that the trial court's order involuntarily terminating her parental rights is not supported by clear and convincing evidence. Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[25] DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). Because Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of subsection 4(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

[26] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cty. Off. of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[27] The purpose of terminating parental rights is not to punish parents but instead to protect the child. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d at 1259.

[28] Mother argues that the trial court's finding that there is a reasonable probability that the conditions that resulted in A.E.'s removal or the reasons for his

continued placement outside her home will not be remedied is not supported by clear and convincing evidence. To assess whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider both the initial basis for the child's removal and the bases for continued placement outside the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Moreover, "the trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denie*d. But trial courts are not precluded "from finding that parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *J.T.*, 742 N.E.2d at 512. Courts may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to provide support. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[29] A.E. was removed in November 2017 because Mother was incarcerated for a robbery conviction and she left A.E. with unsuitable caregivers who lacked stable housing and had tested positive for methamphetamine and marijuana. Mother was incarcerated for significant periods of time throughout the CHINS and termination proceedings for probation violations and a 2019 battery

conviction. Mother was still incarcerated on the dates of the termination fact-finding hearings. Her earliest possible release date is in 2021.[5]

[30] Mother participated in assessments and visitation for approximately six months during the CHINS proceedings. But Mother's participation in services and/or visitation ceased in May 2018 because she relapsed and wanted to evade arrest for an outstanding warrant. Mother's participation in Behavioral Health Court was also terminated because she failed to submit to drug screens and did not attend appointments with her probation officer and recovery coach. Mother was eventually arrested when she committed the 2019 battery, and she gave a police officer her sister's name in an attempt to avoid arrest on an open warrant. Her true identity was discovered when law enforcement officers processed her arrest.

[31] Aside from a brief six-month period of time from December 2017 to May 2018, Mother has not demonstrated that she is able to provide stability for her child. She has been provided with services and assistance to aid her in establishing a stable lifestyle, but she did not take advantage of those opportunities. As a result, she is incarcerated and will remain in prison until 2021. Mother also has not demonstrated that she can refrain from using illegal substances when she is not incarcerated.

---

[5] Mother claims her release date is in January 2021. DCS asserts it is in June 2021, which is consistent with the information provided on the Department of Correction website. www.in.gov/indcorrection/ofs/ofs [https://perma.cc/HF6R-3FQ5] (last visited July 13, 2020).

[32] Mother testified that she wanted to participate in programs through the Department of Correction to address her substance abuse issues, such as Purposeful Incarceration, but admitted that she had only completed the assessment and had not begun treatment on the date of the fact-finding hearing. Tr. pp. 126–127, 132. Mother testified she was willing to participate in DCS services and wanted to participate in other programs aimed at self-improvement while she was incarcerated, such as obtaining her GED. Tr. pp. 128–29. She was also hoping to be placed on work release. Tr. p. 128. The trial court weighed this testimony against Mother's historical behavior and acted within its discretion when it declined to credit the testimony.

[33] Mother has not established that she is able to provide a stable home for A.E. or to refrain from abusing illegal substances. For all of these reasons, we conclude that DCS presented clear and convincing evidence to establish that there is a reasonable probability that the conditions that resulted in A.E.'s removal or the reasons for his continued placement outside her home will not be remedied.[6]

[34] Finally, Mother argues that the trial court's conclusion that termination of her parental rights is in A.E.'s best interests is not supported by clear and convincing evidence. To determine the best interests of children, the juvenile court looks to the totality of the evidence and must subordinate the interests of

_____

[6] Because Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, we decline to address Mother's additional claim that DCS failed to prove that continuation of the parent-child relationship threatens the children's well-being. *In re A.K.*, 924 N.E.2d at 220.

the parents to those of the children. *In re D.D.*, 804 N.E.2d at 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "A child's need for permanency is an important consideration in determining the best interests of a child[.]" *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*. The juvenile court need not wait until a child is irreversibly harmed before terminating parental rights. *McBride*, 798 N.E.2d at 203.

[35] Moreover, a child should not be compelled to suffer emotional injury, psychological adjustments, and instability to preserve parental rights. *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*. The testimony of service providers may support a finding that termination is in a child's best interests. *In re S.K.*, 124 N.E.3d 1225, 1234 (Ind. Ct. App. 2019), *trans. denied*.

[36] A.E. had significant behavioral issues when he was removed from Mother's care. A.E.'s participation in therapy during these proceedings has resulted in a significant improvement in his behavior. A.E. is also more confident and has learned how to process his emotions more effectively. He needs stability and permanency that Mother cannot provide due to her incarceration and unwillingness to address her substance abuse issues. Both the family case manager and CASA testified that termination of Mother's parental rights was in A.E.'s best interests and supported adoption by his current foster parents. Tr. pp. 100–02, 107. For all of these reasons, we conclude that DCS presented clear and convincing evidence to prove that termination of Mother's parental rights was in A.E.'s best interests.

# Conclusion

DCS made reasonable efforts to reunify Mother and A.E. Therefore, Mother has not established that her due process rights were violated. And the trial court's order terminating Mother's parental rights is supported by clear and convincing evidence.

Affirmed.

Riley, J., and Tavitas, J., concur.